UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JASON TUCKER,

                Plaintiff,                          Civil Action No. 12-13414

        v.                                 District Judge George Caram Steeh
                                                 Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION TO
## DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11] AND
## GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [16]

Plaintiff Jason Tucker has considerable difficulty with reading, writing, and, arithmetic; he also has back problems which he claims are very limiting. Based on these impairments, Tucker believes he has been under a "disability" as that term is used in the Social Security Act. He therefore applied for child's disability benefits and supplemental security income. The Defendant Commissioner of Social Security denied these applications. Tucker now appeals that decision. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt.3) are the parties' cross-motions for summary judgment (Dkts. 11, 16). For the reasons set forth below, this Court finds that Tucker has not shown that the Administrative Law Judge acting on behalf of the Commissioner erred in weighing the opinion evidence or his credibility, or in determining his functional limitations. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt.11) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 16) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

### A. Procedural History

When Tucker was a child, the Commissioner of Social Security ("Commissioner") determined, likely based on his cognitive abilities, that Tucker was disabled under the Social Security Act and thus entitled to supplemental security income ("SSI"). (Tr. 24D.) When Tucker turned 18 years old in January 2002 (Tr. 228), the Commissioner was required to make a "redetermination" under adult disability standards. *See* 42 U.S.C. § 1382c(a)(3)(H)(iii); 20 C.F.R. § 416.987(b).[1] Apparently there was some delay, but by April 2005 the Administration concluded that Tucker was no longer disabled. Tucker then pursued further administrative review, and in May 2009, he testified before Administrative Law Judge John Christensen. (Tr. 24D.) In an August 2009 decision, ALJ Christensen determined that Tucker had not been disabled since April 1, 2005, when Tucker was 21 years old, through the date of his decision, when Tucker was 25 years old. (Tr. 24D-24J.) ALJ Christensen's decision is not on appeal, but, as will be discussed, Tucker questions its preclusive effect here.

Nearing a year after ALJ Christensen's decision, Tucker filed an application for child's disability benefits and another application for SSI in June 2010. (Tr. 12.) In both applications he alleged that he became disabled on March 1, 1994, when he was 10 years old. (*Id.*) In October 2011,

---

[1]The five-step sequential analysis for "redeterminations" is the same as the standard five-step analysis for adult supplemental security income applications with two exceptions. In performing a redetermination, the substantial gainful employment step is (logically) omitted, and step one is the standard step two, whether the claimant has a severe impairment. *See* 20 C.F.R. § 416.987(b); *Wagner v. Comm'r of Soc. Sec.*, No. 1:091115, 2010 WL 3036763, at *3 n.5 (N.D. Ohio July 15, 2010), *report and recommendation adopted*, 2010 WL 3000220 (N.D. Ohio July 30, 2010). Also, instead of determining the claimant's residual functional capacity between steps three and four, that determination is made at step three (thus, steps four and five realign with the usual fourth and fifth steps). *Wagner*, 2010 WL 3036763, at *3 n.5.

Tucker testified before ALJ Tammy Thames. (Tr. 12.) In a December 2011 opinion, ALJ Thames concluded that Plaintiff had not been under a "disability," as defined by the Social Security Act, from March 1, 1994, through the date of her decision. (Tr. 12-22.) Her decision became the final decision of the Commissioner on June 5, 2012, when the Social Security Administration's Appeals Council denied Tucker's request for further administrative review. (Tr. 4.) This appeal followed. (Dkt. 1, Compl.)

### B. Medical Evidence

Although Tucker alleges disability beginning in March 1994, the administrative record starts years later, in September 2002. Tucker, then 18, went to the emergency room for back pain. (Tr. 134.) The month prior, he had injured his back when lifting a washer or dryer. (*See* Tr. 134, 201.) The emergency-room staff treated Tucker with ibuprofen and gave him a prescription for Valium. (Tr. 135.)

A couple months later, Tucker went to Rodnick Chiropractic with complaints of neck, upper back, mid back, low back, hip, and leg pain and stiffness. (Tr. 141.) (All the Rodnick Chiropractic records are unsigned; the Court will therefore assume that "Rodnick" performed all examinations. (*Id.*)) Rodnick found that Tucker's range of motion in both his cervical and lumbosacral spine were limited. (*Id.*) And Rodnick found that the following orthopedic tests were positive: Soto-Hall (a test of spinal sprain, strain, subluxation, or fracture),[2] shoulder depression, Lasegue's (straight-leg raising test for lumbosacral radiculopathy), Braggard's (confirmatory test following a positive

---

[2]K. Jeffrey Miller, D.C., et al., 6 J. Chiropractic Med. 163 (2007).

straight leg raising test),[3] Kemp's left, Double Leg Raiser, and Patrick's (a test for hip arthritis).[4] (*Id.*)

Tucker's back pain must have resolved for a time as he did not seek treatment until a year later, in November 2003. (Tr. 142.) Tucker then returned to Rodnick with complaints of neck, back, and hip pain. (*Id.*) Rodnick found that the following tests were positive: Dejerine's triad cough (a test that increases intrathecal pressure to detect lesions in the cranium and spine or thecal sac or disk pathology),[5] Kemp's right, Double Leg Raiser, and Patrick's. (*Id.*)

Following this exam, Tucker apparently managed his back problems for another year: he next saw Rodnick in January 2005. (Tr. 143.) Tucker explained that he had recently lifted a child and felt a crack in his shoulder and pain from both hips radiating to his legs. (*Id.*) Tucker's lumbosacral range of motion was limited. (*Id.*) Positive orthopedic tests were Soto-Hall, Dejerine's triad cough, Single and Double Leg Raiser, Kemp's, and Braggard's. (*Id.*) As before, it appears Tucker did not receive any follow-up treatment.

In March 2005, Dr. Michael Brady (possibly under the supervision of Dr. George Ronan, a licensed psychologist) completed a psychological consultative exam. (Tr. 153-57.) Tucker was now 21 years old, and the exam was completed for the Administration's SSI redetermination. (Tr. 153.) Tucker told Dr. Brady that he was in special education throughout school, which he attended through the 11th grade. (Tr. 153.) He explained that he had never held a job and that it was difficult to obtain one given his poor reading and writing skills. (*Id.*) Tucker's mental status exam was largely normal

---

[3]K. Jeffrey Miller, D.C., 11 Chiropractic Technique 157 (1999).

[4]Dorland's Illustrated Med. Dict. 1920 (31 ed. 2007).

[5]K. Jeffrey Miller, D.C., 6 J. Chiropractic Med. 75 (2007).

except that he did not understand proverbs (a test of abstract thinking) and could not do the "serial sevens" test (a test of concentration and basic arithmetic involving repeatedly subtracting seven from 100). (Tr. 155.) Tucker also struggled with multiplication. (*Id.*) Dr. Brady noted that prior intelligence testing determined that Tucker's IQ was 75. (Tr. 156.) Dr. Brady also administered an intelligence test: "He received a full scale IQ of 75 which places him in the Borderline Intellectual range. His full scale IQ score fell at the 4th percentile indicating that 96% of other individuals of his age scored higher than he did." (Tr. 156.) Dr. Brady diagnosed Tucker with a learning disability and borderline intellectual functioning. (*Id.*)

Although the administrative record is sparse on the issue, Tucker also suffers from asthma. In June 2008, Tucker went to the emergency room with shortness of breath. (Tr. 170-71.)

In March 2009, Tucker returned to Rodnick. (Tr. 144.) The chiropractor provided that Tucker complained "of sharp pain when he bent his head forward that brought him down to the floor." (Tr. 144.) Rodnick said the following orthopedic tests were positive: foraminal compression, Soto-Hall, shoulder depression, Dejerine's triad cough and sneeze, Single and Double Leg Raiser, Kemp's, Braggard's, and Patrick's. (Tr. 144.)

In June 2009, Rodnick noted, "Patient had pain for about 2 weeks but yesterday when patient got out of bed[,] [his] pain was severe. Later when patient was sitting and moved to be comfortable, his entire right side felt pain and he dropped what was in his right hand. This happened 2 times." (Tr. 145.)

In October 2009, Tucker reported that he was crawling on the floor looking for the television remote and his back "popped." (Tr. 159.) Tucker went to the emergency room and received pain medication there. (Tr. 160.) About a week later, Tucker had a follow-up exam with John Roberts,

5

a physician assistant. (Tr. 175-76.) As relevant to this appeal, Roberts diagnosed lower back pain, thoracic back pain, and bilateral hip pain. (Tr. 176.) He prescribed heat, stretching, Motrin, and ordered physical therapy and x-rays. (Tr. 176, 179.) Spinal x-rays revealed scoliosis; hip x-rays were negative. (Tr. 178.)

In November 2010, in connection with Tucker's two June 2010 disability applications, Mark Garner, Ph.D., reviewed Tucker's medical file. (Tr. 181-198.) Dr. Garner believed that Tucker had "mild" restrictions in his activities of daily living, "moderate" difficulties in social functioning, and "moderate" difficulties maintaining concentration, persistence, or pace. (Tr. 195.) Dr. Garner opined: "Claimant's functioning has not changed significantly since the ALJ [Christensen's] decision of 8/24/2009. Claimant retains the ability to do one and two step tasks on a sustained basis. Adopt ALJ [Christensen's] decision." (Tr. 183.)

The next month, Dr. R. Scott Lazzara conducted a consultative examination of Tucker for Michigan's Disability Determination Service. (Tr. 199-204.) Dr. Lazzara summarized his examination findings as follows:

> The patient had some underlying scoliotic disease. He had mild difficulty walking heel and toes and squatting but there were no active radicular symptoms. He had no reflexive changes or sensory loss and his gait was normal. His pain appeared to be somewhat exaggerated but he definitely had some scoliotic disease. His upper extremities were normal. At this point pain management and supportive care would be helpful.
>
> Please note he has a history of asthma and "blurry vision" in the left eye. He had no difficulty ambulating around the room, his right eye was normal by Snellen chart. His lung fields were clear today.

(Tr. 203-03.)

In August 2011, Tucker, now 27 years old, saw Dr. Aparna Vallabhaneni for the first time.

6

(Tr. 217.) Dr. Vallabhaneni noted a prior history of back pain that was "worse now." (Tr. 217.) Tucker reported that his back pain radiated to both legs, and that he felt numbness and tingling in both legs and feet. (*Id.*) In accord with these subjective complaints, Dr. Vallabhaneni assessed back pain with radiation to both legs. (Tr. 218.) She ordered an x-ray and provided a "script" for rotation and flexion. (*Id.*) Dr. Vallabhaneni noted that due to insurance problems, Tucker could not afford physical therapy, an MRI, Neurontin, or an EMG. (*Id.*) The x-ray revealed mild disc-space narrowing at L5-S1; it was otherwise negative. (Tr. 220.)

In September 2011, Tucker told Dr. Vallabhaneni that he had been experiencing headaches and right-eye pain for about a month. (Tr. 216.) Dr. Vallabhaneni diagnosed migraine headaches and started Tucker on Imitrex on an as-needed basis. (*Id.*) Dr. Vallabhaneni also ordered an MRI of Tucker's spine. (*Id.*) The radiologist's impression was "[m]ild degenerative changes including mild bulging disk at the T11-12 disk level and L5-S1 disk level and minimal bulging disk at the L3-4 disk level." (Tr. 214.) The MRI physician further noted, "No focal disk herniation, spinal canal or significant neural foraminal stenosis." (Tr. 214.)

In October 2011, the month of Tucker's administrative hearing before ALJ Thames, Dr. Vallabhaneni opined on Tucker's functional capacity. (Tr. 223-26.) She provided that Tucker had a "dull aching" pain in his lower back. (Tr. 223.) She believed that this pain would "frequently" interfere with Tucker's ability to pay attention and concentrate. (Tr. 224.) Dr. Vallabhaneni opined that Tucker could walk only two or three blocks before either experiencing severe pain or needing to rest. (*Id.*) She also believed that Tucker could stand for only 10 minutes at a time and do a combination of standing and walking for less than two hours total in an eight-hour workday. (Tr. 225.) According to Dr. Vallabhaneni, Tucker could "occasionally" lift less than 10 pounds, but

"never" 10 pounds or more. (Tr. 226.) She also provided that Tucker would need to miss work three days per month because of his back condition and associated treatment. (*Id.*)

**C. Testimony at the Administrative Hearing Before the ALJ**

At his October 2011 hearing before ALJ Thames, Tucker testified about his recent treatment with Dr. Vallabhaneni. Tucker explained that Dr. Vallabhaneni had prescribed three medications that made him sleepy. (Tr. 291.) Tucker detailed the effects: he woke at 9:00 a.m. but the medication put him back to sleep by 11:00 a.m. or noon; he would then sleep until 6:00 or 7:00 p.m. and only stay awake for about an hour before going back to sleep. (Tr. 300-01.) When ALJ Thames asked if Tucker had reported this drowsiness, and remarked that Tucker had been treating with Dr. Vallabhaneni for about three months, Tucker stated, "Yeah, I'm going to get a hold of her." (Tr. 304.)

Tucker also described his back pain. He stated that even with medication his back still hurt. (Tr. 294.) Tucker provided that his back made it difficult to stand up: "I got up at 7:30 [this morning] and sat on the couch until we left at about 8:30 and it took three tries to get off the couch. . . . And it took me two tries to get out of the car." (Tr. 297.) Tucker stated that he could not bend down to wash his feet or lower legs when showering. (Tr. 295.) Similarly, if he needed to pick up a pencil from the floor, he would usually find "something to sit on and . . . move [the pencil] over with [his] foot; try to . . . get where [he could] kind of get a hold of it." (Tr. 296.) Although he did not testify to it, in his September 2010 self-completed function report, Tucker provided that he could only walk 150 feet, and after that, he would need to rest for 20 to 30 minutes to catch his breath. (Tr. 91.) On that form, Tucker also provided that he could only lift five pounds. (*Id.*)

Tucker also testified, more briefly, about his other impairments. He said that his asthma

8

made it difficult for him to breathe when it was hot. (Tr. 288.) He also stated that he had "headaches all the time" that caused his eyes to "burn[]." (Tr. 302.) Regarding his mental impairments, Tucker testified that he could not tell time on a traditional clock: "I don't know what you call them, the ones with the hands. I mean I could sit there for hours and, and count the numbers and stuff and I still wouldn't be able to tell you what time it is." (Tr. 292.) He also stated that he had difficulty with basic math, including "[t]he one with the X" and "the one with the line with the two dots." (Tr. 292-93.) He also testified to dyslexia and difficulty reading. (Tr. 293.)

After Tucker testified, ALJ Thames solicited testimony from a vocational expert to determine whether jobs would be available for someone with functional limitations ALJ Thames believed approximated Tucker's. Specifically, she asked about job availability for a hypothetical individual of Tucker's age, education, and work experience who was capable of occasionally (one-third of the workday) lifting and carrying 20 pounds, frequently (two-thirds of the workday) lifting and carrying 10 pounds, a combination of standing or walking for about six hours in an eight-hour workday, sitting for about six hours in an eight-hour workday, occasionally climbing ramps or stairs, but never ladders, ropes or scaffolds, frequently balancing, and occasionally stooping, kneeling, crouching or crawling. (Tr. 306.) The ALJ explained that this individual could not, however, be exposed to extreme temperatures (such as a cold and heat and humidity), to confined spaces, or to dust, odors, fumes, and gasses. (Tr. 306.) The ALJ additionally limited the hypothetical person to simple, routine tasks in a low stress working environment, "meaning minimal changes in the workplace setting" and no more than occasional contact with the general public. (*Id.*) Last, ALJ Thames excluded certain specific job tasks: "handling money, including but not limited to the position of a cashier," "reading detailed instructions," writing "job reports," and driving. (*Id.*)

Taking all of these functional limitations into consideration, the vocational expert testified that the there would be unskilled jobs at both of the "light" and "sedentary" exertional levels that this individual could perform. (Tr. 306-07.) The expert, however, at the ALJ's request, only specified the following unskilled, light jobs: assembly at a bench or table, inspection at a bench or table, and packing at a bench or table. (*Id.*)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Supplemental security income and child's disability benefits are available only for those under a "disability":

> [the] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 402(d)(1), 423(d)(1)(A); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that "disability" is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors

(age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Thames found that Tucker had not engaged in substantial gainful activity since the alleged disability onset date of March 1, 1994. (Tr. 15.) At step two, she found that he had the following severe impairments: asthma, a learning disorder, borderline intellectual functioning, degenerative disc disease in the lumbar spine, and chronic back pain. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 15-17.) Between steps three and four, the ALJ determined that Tucker had the following residual functional capacity:

> [The ability] to perform less than the full range of "light" work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently. He can stand and/or walk for no more than a total of 6 hours per 8-hour workday with normal breaks. The claimant can sit for no more than a total of 6 hours per 8-hour workday with normal breaks. He can occasionally climb ramps or stairs but can never climb ladders, ropes, or scaffolds. The claimant can frequently balance and can occasionally stoop, kneel, crouch, or crawl. The claimant's work environment must be well-controlled, with no exposure to extreme temperatures (cold and heat) and humidity. He should never be exposed to dust, odors, fumes, and gases while in confined places. The claimant retains the mental capacity to perform simple, routine tasks in a low-stress work environment. Such an environment should expose the claimant to no more than minimal changes in workplace setting and should involve no more than occasional contact with the general public. The claimant cannot perform any work that would require him to handle money. This includes, but is not limited to, positions such as a cashier. The claimant cannot perform any job that would require him to read detailed instructions, write job reports,

and/or drive.

(Tr. 17-18.) At step four, the ALJ found that Tucker had no past relevant work. (Tr. 20.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Tucker's age, education, work experience, and residual functional capacity. (Tr. 21.) ALJ Thames therefore concluded that Tucker was not disabled as defined by the Social Security Act from the alleged onset date through the date of her decision. (Tr. 22.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation

12

marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Before turning to the merits, some procedural issues need to be addressed. Tucker is entitled to child disability benefits only if, among other things, he "is under a disability (as defined in section 423(d) . . .) which began before he attained the age of 22." 42 U.S.C. § 402(d)(1)(B). Thus, it is not enough for Tucker to show that he has been under a disability since his June 2010 application: that disability would have to extend back to before his 22nd birthday in January 2006. *See id.*; *Beasich v. Comm'r of Soc. Sec.*, 66 F. App'x 419, 420-21 (3d Cir. 2003) ("To receive child's benefits based on his deceased father's earnings record, [the claimant] needed to demonstrate, inter alia, that he had a disability before attaining age 22 and that this disability continued without interruption through the date of his application."); *Starcevic v. Comm'r of Soc. Sec.*, No. 08-13128, 2009 WL 2222631, at *6 (E.D. Mich. July 22, 2009) ("To be eligible for childhood disability benefits the Plaintiff must establish that she was under a disability that began before age twenty-two and was continuously

13

disabled from the date of her twenty-second birthday through the date that she applied for benefits."). This requirement is problematic for Tucker's child disability benefits claim because ALJ Christensen found that Tucker was not disabled from April 1, 2005, when Tucker was 21 years old, through the date of his decision, when Tucker was 25 years old. (Tr. 24J.) In other words, Tucker's appeal of his child's disability claim can only succeed if there is a sound basis for not deferring to ALJ Christensen's decision.

But there is good reason for deferring. As recognized by ALJ Thames, in *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), the Sixth Circuit held that an ALJ deciding a second disability claim involving an unadjudicated disability period is bound, absent a showing of "changed circumstances," to adopt the Commissioner's findings made in adjudicating a preceding disability claim. (*See* Tr. 12.) Tucker says that the changed condition is his back condition, which ALJ Christensen did not consider. (*See* Dkt. 17, Pl.'s Reply at 4-5.) But the medical evidence summarized above makes plain that Tucker's back problems did not become significant until long after his 22nd birthday. In fact, there are no back treatment records for the four-year period from January 2005 to March 2009. Perhaps acknowledging this, Tucker appears to limit his challenge to the preclusive effect of ALJ's Christensen's decision to his supplemental security income claim. (*See* Pl.'s Reply at 4.) This Court therefore believes that ALJ Thames reasonably applied *Drummond* to Tucker's child disability benefits application and sees no reason to further consider Tucker's challenge to that decision.

As for Tucker's appeal of the Commissioner's denial of his supplemental security income application, the Court will assume, without deciding, that Tucker's back problems are a "changed circumstance" such that ALJ's Christensen decision is not dispositive of the SSI appeal.

But the supplemental security income application does have another procedural nuance. In particular, a claimant is entitled to supplemental security income, at the earliest, the month after he files his application. 42 U.S.C. § 423(b); 20 C.F.R. § 416.335. Here, as mentioned, Tucker applied for SSI in June 2010. The focus, therefore, should be on Tucker's functional ability around that time. *See Wells v. Comm'r of Soc. Sec.*, No. 1:07-666, 2008 WL 2783254, at *8 (W.D. Mich.), *report and recommendation adopted*, 2008 WL 2783254 (W.D. Mich. July 17, 2008) ("SSI benefits are not awarded retroactively for months prior to the application . . . . Thus, the question before the ALJ was whether plaintiff was disabled on or after [the application date], not the alleged 1999 onset of disability date.").

With respect to the merits, Tucker raises four claims of error. He says that ALJ Thames failed to adequately account for his moderate limitations in concentration, persistence, or pace. (Pl.'s Mot. Summ. J. at 10-11.) Relatedly, he contends that the ALJ's residual functional capacity assessment and hypothetical to the vocational expert overstated his abilities. (*Id.* at 15-16.) He also claims that ALJ Thames' credibility analysis was internally inconsistent and thus not adequately articulated. (*Id.* at 11-14.) Last, he claims that ALJ Thames erred in evaluating the opinion of his treating physician, Dr. Vallabhaneni. (*Id.* at 17-18.) If Tucker is correct on this last point, that would strengthen his other claims of error (except, perhaps, his credibility argument). Accordingly, the Court begins there.

### A. The ALJ Reasonably Discounted Dr. Vallabhaneni's Opinion

As an initial matter, the parties dispute whether Dr. Vallabhaneni was a "treating" or "examining" source at the time she authored her October 2011 opinion. The distinction is significant because the regulations, and the accompanying case law in this Circuit, provide that treating-source

15

opinions qualify for special deference (and, under certain conditions, complete deference). *See* 20 C.F.R. § 416.927(c)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Further, claimants have the right for an ALJ to explain why their treating source's findings were not credited. *See* S.S.R. 96-2p, 1996 WL 374188, at *4-5; *Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544.

Although not one-sided, the analysis ends in the Commissioner's favor. It is true that Dr. Vallabhaneni ordered and reviewed an x-ray and an MRI; not only is this atypical of a consultative exam, but it also gave her substantial familiarity with the objective condition of Tucker's spine. On the other hand, before Dr. Vallabhaneni issued her October 2011 opinion, she had only seen Tucker on two prior occasions. (Tr. 217 (August 2011 new patient visit); Tr. 216 (September 2011 visit for headaches).) Our Court of Appeals says that a physician who sees a claimant only twice is usually not a treating source. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. . . . Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship."); *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 n.3 (6th Cir. 2011) (noting "it is questionable whether a physician who examines a patient only three times over a four-month period is a treating source—as opposed to a nontreating (but examining) source"). And the rationale behind this rule-of-thumb applies here: treating-source physicians are held in special regard because of their "detailed, longitudinal picture" of the claimant; absent that, there may not be much, if any, difference between a treating physician and one who performs a consultative exam. 20 C.F.R. § 416.927(c)(2) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal

picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source."). Further, Dr. Vallabhaneni not only saw Tucker just twice, but those appointments spanned just two-months. So Dr. Vallabhaneni did not know how Tucker's back condition would respond to treatment. Nor could she have known how Tucker's condition did and would progress over time. The record therefore favors a finding that Dr. Vallabhaneni was not a treating source.

Tucker's rebuttal does not persuade the Court to reach a different conclusion. He says,

> The [Commissioner's argument] ignores the reality of the situation. Plaintiff has limited resources. He was evaluated by Dr. Vallabhaneni for treatment purposes. Simply put, Dr. Vallabhaneni treated Plaintiff. Any other conclusion ignores these immutable facts. There was no valid reason to deny Dr. Vallabhaneni's status as a treating physician or discount his [sic] opinion regarding Plaintiff[']s limitations.

(Pl.'s Reply at 6.) Most of this is conclusory. Tucker essentially provides that Dr. Vallabhaneni is a treating source because he says she is. As for the implied insurance problem, this does not change the fact that Dr. Vallabhaneni simply did not have a "detailed, longitudinal picture" of Tucker's back condition at the time she authored her October 2011 opinion.

Given that Dr. Vallabhaneni was not a treating source, ALJ Thames' decision to assign her opinion "very little weight" was reasonable. She provided that the physician's opinion was "not consistent with the claimant's description of his daily activities or with the rest of the objective evidence." (Tr. 20.) Generally, this type of statement is problematic because it lacks detail: which activities, what evidence? *Cf. Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain

17

why it is the treating physician's conclusion that gets the short end of the stick."). But the ALJ's narrative is brief and, regarding Tucker's back pain, focuses on only a handful of records. The Court therefore believes that ALJ Thames explained well enough why she was discrediting Dr. Vallabhaneni's opinion. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("[E]ven if the purpose of the reasons-giving requirement in § 404.1527(d)(2) [now (c)(2)] applies to the entire regulation, the SSA requires ALJs to give reasons for only *treating* sources.").

And her explanation is supported by substantial evidence. First, ALJ Thames correctly noted that x-rays from October 2009 showed "minimal" and "mild" scoliosis without identifying further problems. (*Compare* Tr. 19, *with* Tr. 178.) Second, she correctly pointed out that an October 2011 MRI revealed only "mild" degenerative changes and "mild" and "minimal" bulging. (*Compare* Tr. 19, *with* Tr. 214.) In fact, the radiologist's MRI report explicitly provides, "No focal disk herniation, spinal canal or significant neural foraminal stenosis." (Tr. 214.) Third, the ALJ appropriately relied on findings from Dr. Lazzara that Tucker had no "active radicular symptoms" and, while he had scoliosis, his reports of pain appeared to be "somewhat exaggerated." (*Compare* Tr. 19, *with* Tr. 202.) This evidence is inconsistent with Dr. Vallabhaneni's comparatively extreme functional limitations that Tucker could stand for only ten minutes at a time and that he could not even lift 10 pounds one-third of a workday. (Tr. 225-26.) Accordingly, the Court believes that ALJ Thames reasonably assigned Dr. Vallabhaneni's opinion "very little weight."

### B. Plaintiff Has Not Shown that the ALJ Erred in Assessing His Credibility

Tucker says that ALJ Thames' credibility findings were "contradictory." (Pl.'s Mot. Summ. J. at 15.) He refers to the following passage from the ALJ's narrative:

> The following objective evidence confirms the existence of the claimant's alleged impairments. *This evidence simultaneously*

18

*illustrates the inconsistency between his report of functional limitations and the objective findings and learned assessments, as well as invariably reveals that the claimant's allegations convey a level of severity not supported by the objective data. . . .*

The most recent electrodiagnostic data shows that the claimant's spine has gone through some degenerative changes since December 2010. For example, X-rays of the claimant's lumbar spine, taken on August 10, 2011, show development of degenerative disc space narrowing at the 5-1 level (Exhibit B12F at 8). However, these findings were qualified by an MRI scan of the claimant's spine, from October 6, 2011, that revealed "mild" degenerative changes, including "mild" bulging disc at the T11-12 1evels of the claimant's thoracic spine and the L5-S1 level of his lumbar spine; and "minimal" bulging at the L3-41evel (*Id.* at 2). No focal disc herniation or spinal canal or significant neural foraminal stenosis were noted. *Such phenomena could be expected to reasonably account for the claimant's reported level of pain and alleged loss of function.*

(Tr. 19 (emphases added).) Tucker says that the two emphasized sentences are inconsistent because, in the first, the ALJ stated that the objective evidence did not support his allegations, but then, in the second, she stated that the objective evidence did support his allegations. (Pl.'s Mot. Summ. J. at 4-5.)

This reading of the ALJ's narrative is strained. Read as a whole, ALJ Thames unmistakably believed that the objective medical evidence did not support Tucker's allegations about his back condition. As for the two particular sentences in question, the Court agrees with the Commissioner that when the ALJ used the phrase "[s]uch phenomena" she referred to the conditions in the prior sentence: disc herniation, spinal canal stenosis, and neural foraminal stenosis. (*See* Tr. 19.) In other words, she meant that "[Abnormalities such as disc herniation, spinal canal stenosis, and neural foraminal stenosis, if present,] could be expected to reasonably account for the claimant's reported level of pain and alleged loss of function." (Tr. 19.) Accordingly, the Court perceives no

19

inconsistency.

### C. Plaintiff Has Not Shown that the ALJ Reversibly Erred in Assessing His Residual Functional Capacity

Tucker also claims that the ALJ erred because her residual functional capacity assessment, her determination of the most Tucker can still do despite his impairments, was inaccurate. (Pl.'s Mot. Summ. J. at 10-11.) More specifically, Tucker says that ALJ Thames failed to include sufficient limitations to account for his deficits in concentration, persistence, or pace ("CPP"). (*Id.*) The Court does not believe that Tucker has shown that ALJ Thames reversibly erred in this way.

Tucker points out that in conducting the supplemental security income redetermination, ALJ Christensen found that he had moderate problems in CPP and that ALJ Thames adopted, or was required to adopt, these findings when she made her decision. (Pl.'s Mot. Summ. J. at 10; Pl.'s Reply at 5.) Assuming so, this does not support Tucker's claim of error. It is true that ALJ Christensen stated, "With regard to concentration, persistence or pace, the claimant has moderate difficulties (giving him the benefit of the doubt) given his borderline intelligence." (Tr. 24G.) But he also concluded,

> There is little evidence of ongoing disability. Prior records indicate the claimant's asthma is essentially controlled. Prior intelligence testing confirmed the claimant has borderline intellectual functioning. However, there is no indication the claimant could not perform simple unskilled work. The claimant even admitted he could probabl[y] perform work that did not involve any writing. The claimant is fully capable of full time restricted work.

(Tr. 24I.) Tucker cannot cherry pick from ALJ Christensen's opinion. Whatever Tucker's basis for asserting that ALJ Thames was required to defer to ALJ Christensen's finding of "moderate" difficulties in CPP, that same basis would require deference to ALJ Christensen's ultimate conclusion that Tucker could perform simple, unskilled work.

20

Next, Tucker implies that his back pain affects his ability to pay attention and concentrate, and that this pain must therefore be considered together with his CPP deficits owed to his intellectual functioning. (*See* Pl.'s Mot. Summ. J. at 7-8, 11.) But this argument seems to be a post hoc basis for establishing disability. At the administrative hearing, while alleging considerable pain, Tucker never mentioned that his back pain affected his ability to concentrate or pay attention, let alone that it affected those abilities such that he could not perform even simple, routine tasks. Moreover, Tucker's claim of error relies primarily, if not exclusively, on Dr. Vallabhaneni's opinion: "Dr. Vallabhaneni, who was the claimant's treating physician, stated that claimant had bilateral lower extremity radiating pain with chronic low back pain which was severe enough to interfere with attention and concentration." (Pl.'s Mot. Summ. J. at 7; *see also id.* at 8.) But, as discussed, ALJ Thames reasonably assigned Dr. Vallabhaneni's non-treating-source opinion little weight.

Relatedly, Tucker contends that ALJ's Thames' residual functional capacity assessment (and her corresponding hypothetical to the vocational expert) did not adequately account for his need to nap throughout the day. (*Id.* at 16.) But ALJ Thames had reason to question Tucker's testimony on this point: Tucker provided that his medication caused him to sleep about 20 hours per day, yet he had not returned to see Dr. Vallabhaneni about this. (*See* Tr. 300-01.)

And even assuming that this testimony should be fully credited, the Court does not find reversible error. As Tucker said at his hearing, the sleep-inducing medications were first provided in August 2010. (Tr. 303.) In order for ALJ Thames to award disability benefits, however, it must be that Tucker was under a disability that had lasted or would be expected to last for 12 months. 42 U.S.C. § 423(d). Yet Tucker had only been experiencing medication side effects for about two-and-a-half months by the time of his administrative hearing. ALJ Thames could reasonably assume that

21

Tucker's medications—causing him to sleep 20 hours per day—would not go unadjusted for another nine months.

Last, as he has done in other cases, Tucker's counsel again relies on *Edwards v. Barnhart*, 383 F. Supp. 2d 920 (E.D. Mich. 2005) for the proposition that if an ALJ finds that a claimant has a "moderate" limitation in CPP at step three, it is error for the ALJ to omit a CPP-specific limitation (e.g., "no high-production quotas") from the residual functional capacity assessment of the claimant. (Pl.'s Mot. Summ. J. at 10-11.) This rule has little role here. ALJ Thames did not find that Tucker had "moderate" limitations in CPP; instead she found that he did not meet the criteria at step three because Tucker's intellectual functioning was too high. As for ALJ Christensen's decision, Tucker cannot take advantage of his "moderate" CPP finding without also accepting his conclusion that he could perform simple, unskilled work.

In short, Tucker has not shown that ALJ Thames erred in assessing his residual functional capacity or in crafting her hypothetical to the vocational expert.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that Tucker has not shown that ALJ Thames erred in weighing the opinion evidence or his credibility, or in determining his functional limitations. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt.11) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 16) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  June 12, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 12, 2013.

s/Jane Johnson
Deputy Clerk

23